## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ROBERT SEDILLO GUTIERREZ,

          Movant/Defendant,

  vs.

UNITED STATES OF AMERICA,

          Respondent/Plaintiff.

CIVIL NO.  08-711 RB/LFG
Crim. No.   05-CR-217 RB

### MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND PROPOSED FINDINGS AND CONCLUSIONS[1]

### Findings

1.    **THIS MATTER** comes before the Court on Robert Sedillo Gutierrez's *Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody* [Doc. 1], filed July 30, 2008.  On September 28, 2008, the United States filed a *Response*, [Doc. 7], and, on October 6, 2008, Gutierrez filed both a *Declaration* [Doc. 10], and *Supplemental Pleadings in Support of Defendant's Title 28 U.S.C. § 2255 Motion* [Doc. 11].  Both parties requested an evidentiary hearing, which was conducted on June 22, 2011 [See Doc. 53].

---

[1] **At the conclusion of the evidentiary hearing, the Magistrate Judge announced his preliminary findings and conclusions and advised that the parties would have the opportunity to submit their own proposed findings.  This would have resulted in a two-step process of proposed findings, followed by a Report and Recommendation.  On further reflection, and because the parties are afforded 14 days to object, the Magistrate Judge simply issues his Report and Recommendation.  This revised process will expedite the disposition of the case and, yet, allow the parties to protect their record for further review.**

      **Accordingly, within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.**

2.    In making its recommendation on this matter, the Court examined all of the pleadings and

attachments in this civil proceeding and the related criminal case [No. CR 05-217],[2] and

reviewed transcripts of the pertinent criminal proceedings and hearings before the district

court. After carefully considering the pleadings, attachments, argument by parties, and the

pertinent law, the Court recommends that the motion be denied and this civil proceeding be

dismissed with prejudice.

## Background

3.    On February 3, 2005, Robert Sedillo Gutierrez ("Gutierrez") was charged in a 1-count

indictment with possession with intent to distribute 500 grams and more of

methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), and 18 U.S.C. § 2.

[CR Doc. 10].  Gutierrez entered a plea of not guilty, [CR Doc. 12], and proceeded to trial.

Gutierrez's first trial ended in a mistrial, but the jury in his second trial found him guilty as

charged. [CR Docs. 68, 114]. On August 7, 2006, Gutierrez was sentenced to a 360-month

term of imprisonment.  On January 31, 2008, the Court of Appeals for the Tenth Circuit

affirmed on direct appeal.  See United States v. Sedillo-Gutierrez, 263 Fed.Appx. 659 (10th

Cir. Jan. 31, 2008).

4.    The underlying criminal charge against Gutierrez grew out of the search of a residence

occupied by Estanislada Cardona ("Cardona") while Roswell, New Mexico  police were

investigating the theft of a riding lawnmower believed to be located at Cardona's residence.

5.    When police arrived at Cardona's home to execute a previously obtained search warrant,

Cardona, a methamphetamine user and street-level methamphetamine dealer, had

---

[2] The Court refers to pleadings in the criminal case, No. CR 05-217, as CR Doc. __.  Pleadings in
this civil proceeding are referred to as Doc. ___.

approximately one ounce of methamphetamine in her purse.  As police were arriving, she hid the contraband in the freezer, and also secreted a box containing marijuana, a smoking pipe, and drug paraphernalia under a mattress in her child's room.

6.     Police found the methamphetamine in the freezer, the marijuana, drug paraphernalia, packaging materials, an electronic scale, and a 22 caliber rifle in the Cardona residence.

7.     Cardona made inculpatory statements about her methamphetamine dealing, and misrepresented to the police that she obtained the methamphetamine at a park.

8.     Cardona subsequently identified Gutierrez as her methamphetamine supplier.

9.     Because she faced a significant term of imprisonment if charged and convicted, and because she was upset that Gutierrez denied her financial assistance, Cardona agreed to cooperate with law enforcement authorities in return for leniency.  She became a confidential informant.

10.     The *quid pro quo* that Cardona ultimately would receive for her cooperation included release from jail; dismissal of all drug charges against her; no prosecution for the stolen lawnmower; and a cash payment of $5,000.00.

11.     Cardona told police that she was a daily methamphetamine user and bought drugs for her own addiction as well as to sell because of financial pressures.

12.     Cardona explained that she met Gutierrez through a mutual friend and methamphetamine user when Cardona was 23 years old.

13.     According to Cardona, over the course of one year, she purchased drugs from Gutierrez on a daily basis, and often two times a day.

14.     Cardona purchased drugs from Gutierrez at a residence located at 1101 North Kansas Street in Roswell.

3

15.     Cardona told police that when she would go to the North Kansas Street residence for the drugs, and after speaking with Gutierrez, she would observe Gutierrez walk to the back yard. He would be back there for a few minutes, and then he would return to the front. Thereafter, she would receive the drugs from Gutierrez and drive away.

16.     At times, Cardona would contact Gutierrez via cell phone. Otherwise, she would simply drive to the North Kansas Street address.

17.     The North Kansas Street property was not owned by Gutierrez but, rather, by an elderly man named Miterio Peralta ("Peralta").

18.     After receiving information from Cardona concerning drug purchases, Roswell police officers conducted surveillance on the North Kansas Street home and observed drivers in various vehicles engage in the same pattern. That is, a vehicle would arrive at the North Kansas Street address, and Gutierrez would meet with the driver for a brief encounter. Gutierrez would then walk to the back of the residence and, after several minutes, return to the vehicle, where there would be another brief encounter. The driver would then leave in the vehicle.

19.     At trial, officers conducting surveillance on the North Kansas Street address testified that what they observed was consistent with drug-trafficking activities.

20.     Based upon the information provided by Cardona, as well as upon the observations by the Roswell  officers on surveillance, law enforcement obtained search warrant for both the North Kansas Street address and Gutierrez's home address.

21.     A search of the North Kansas Street address resulted in nothing of evidentiary value. No drugs,  drug paraphernalia or drug packaging material were found.

22.     However, as officers gathered in the back yard of the North Kansas Street address to

4

continue their search, one observed a ladder propped against a 10-foot corrugated fence.

23.    On the other side of the fence, opposite the North Kansas Street address, was a fenced junkyard full of vehicles, oil field drilling pipe, car parts, car hoods and other assorted junk. The junkyard was completely fenced and the gates welded shut.

24.    Draped over the fence, directly above the ladder, were two pairs of pants.   A testifying officer explained that the pants appeared to provide protection for anyone climbing over the fence.

25.    From the top of the ladder, the police observed footprints from the fence to an old junked delivery truck.  A path was visible from the fence to the junked delivery truck.

26.    A witness testified that access to the junkyard could be obtained by cutting off the bead welds.  Also, a hole in the fence was discovered on the east side of the fence.  It was covered by tin, and this hole would have allowed passage between the North Kansas Street address and the junkyard without the need to climb the fence.

27.    The junkyard was owned by a Mr. Hugo Killgo ("Killgo"), who resided in Arizona, and managed by Killgo's brother, who resided in Roswell.

28.    Law enforcement officers contacted Killgo, and sought his consent to search the junkyard. Killgo consented and his brother signed a written consent form.

29.    The junkyard was not owned by Gutierrez, and he makes no claim of ownership over any items located therein.

30.    A search of the interior of the junked delivery truck resulted in the discovery of an electronic scale, plastic baggies, and a bag of methamphetamine.  Rubber gloves were located in other areas of the junkyard.

31.    While the officers were searching the junkyard, Cardona telephoned Detective Yslas, the

5

case agent at the time, and advised him that Gutierrez had earlier bragged to her that he had lots of methamphetamine, in pound quantities, and lots of buried money.

32.    After receiving this information from Cardona, Yslas contacted the officers who were actually searching the junkyard.  They began to look for evidence of buried drugs and money.

33.     Outside the delivery vehicle, searching officers discovered methamphetamine in a 5-gallon paint bucket and under a piece of corrugated tin with freshly disturbed dirt.  The amount of methamphetamine found far exceeded 500 grams; indeed, it was close to 8 pounds.

34.    Also in the junkyard, police observed what appeared to be a brick or a stone positioned on top of a white piece of paper as if to prevent the paper from blowing away.  The paper was a cell phone bill with Gutierrez's name and telephone number and his mother's address. This bill was photographed at the junkyard. [See CR Doc. 110, attached Exh. List (Exh. 2g)].

35.     Subsequent subpoenas served on cell phone service providers confirmed that the cell phone number was assigned to Gutierrez, and that there were numerous calls between his phone and Cardona's phone.

36.    While law enforcement officers were searching the junkyard, a neighbor, Mr. Ortiz ("Ortiz") came over to talk to police.  He stated that he had observed Gutierrez climb the fence and enter the junkyard, and thought that Gutierrez might be stealing items from Mr. Killgo.

37.    Killgo was Ortiz's friend, and Ortiz was concerned about Gutierrez's presence in the junkyard.

38.    A search warrant was also executed on Gutierrez's own residence at Pennsylvania Street, in Roswell.  No drugs or drug paraphernalia were found, but in a closet in Gutierrez's residence, law enforcement officers found a hand-written list of precursor items; that is,

items and chemicals used in the manufacture of methamphetamine.

39.    Having found no money at the junkyard, and based on Cardona's suggestion to Detective

Yslas, police went to search the homes of Gutierrez's mother and sister.  There, they sought

and obtained signed consents to search.

40.    Gutierrez does not own or live in either of those residences, and claims no ownership of any

property or items found in, around, or under them.

41.    At the home of Gutierrez's mother, law enforcement officers observed what appeared to be

freshly disturbed dirt under a tree, in the same fashion as earlier observed in the junkyard.

They found, buried under the tree, a plastic pickle jar containing more than $77,000.00 in

currency.

42.     Gutierrez sought to suppress the seized drugs and money. [See CR Doc. 30].  However, the

district court concluded that Gutierrez lacked standing to challenge the seizures, as he did

not claim possession or ownership of the drugs, money, or property searched.  Alternatively,

the Court found that valid consent to search was obtained from the property owners, and,

therefore, no warrant requirement existed. [See CR Doc. 57 at 3-7].

43.    The seized drugs tested positive for the presence of methamphetamine.

### Trial Number One: Representation by Brian Pori, Esq.

44.    For his first trial, Gutierrez retained Brian Pori, Esq. ("Pori").  Pori became licensed as an

attorney in 1988 and, with the exception of one year in civil practice, has devoted his entire

professional career to the practice of criminal law.

45.    Pori has clerked for the California Supreme Court, and spent seven years with the California

State Public Defender in Oakland.  Pori spent one and one-half years with the State Public

Defender in New Mexico, then joined the Rothstein Law Firm, where he worked for

approximately four and one-half years . He has operated his own private practice devoted to criminal law, Inocente, P.C., and currently serves in the Office of the Federal Public Defender.

46.     Pori estimated that he has represented thousands of criminal defendants over the years and has taken approximately 40 felony cases to trial.

47.     According to Pori, prior to trial, he met with Gutierrez on four or five occasions. He reviewed the government's evidence with Gutierrez, but could not specifically recall providing Gutierrez with copies of witness statements or affidavits. However, it is Pori's practice to provide such information to all of his clients, and his recollection is that Gutierrez was, in fact, billed for copies. Thus, Pori concluded that although he could not specifically recall doing so, he likely provided the information.

48.     In preparation for trial, Pori retained the services of a criminal investigator. He and the investigator went to Roswell and interviewed several witnesses, including Gutierrez's son; Gutierrez's sisters; the owner of the Kansas Street property; Mr. Peralta; and a friend of confidential informant Cardona. Pori prepared extensive examination outlines for each of these potential witnesses. [See Doc. 53, attached Exh. List (Exhs. 3-7)].

49.     Pori, in collaboration with attorney Scott Davidson, with whom he shared office space, prepared and argued a motion to suppress, seeking to preclude the introduction of evidence that he maintained was the fruit of several unconstitutional searches. [See CR Doc. 30 at 2 ("On December 3, 2004, officers of the Roswell, New Mexico Police Department violated the Fourth Amendment five times. . . .")]. The motion was denied. [See CR Doc. 57].

50.     Pori was, however, successful in preventing the government from introducing potentially damaging prior-acts evidence pursuant to Rule 404(b) of the Federal Rules of Evidence. [See

id.].

51.   The government offered Pori a plea bargain which, if accepted by the district court, would likely have resulted in a sentence of 10 years.  Pori indicated that at his first meeting with Gutierrez, he discussed the plea and conveyed the offer to him, but concedes that he was not vigorous in his attempts to convince Gutierrez to accept the plea.  Pori thought the case was defensible, and because Gutierrez did not wish to take the plea, Pori did not seek to talk Gutierrez into such a resolution.

52.   There was a second offer by the government, at which time Assistant United States Attorney Kelly Burnham told Pori that she would again offer a plea which, if accepted by the district court, also would likely result in a 10-year sentence.  However, cautioned AUSA Burnham, should Gutierrez reject that offer, the government would seek a sentencing enhancement pursuant to 21 U.S.C. § 851.  At that point, Pori wrote a letter to Gutierrez (1) conveying the offer; (2) explaining the plea agreement and its benefits; and (3) outlining potential sentences that could be imposed if there was an enhancement. [See Doc. 53, attached Exh. List (Exh. 1, May 13, 2005 letter from Brian A. Pori to Robert Sedillo Gutierrez)].  After having sent Gutierrez the letter, Pori met with Gutierrez and, on this occasion, urged Gutierrez to take the plea.  After this offer was conveyed, Gutierrez rejected the offer and insisted on going to trial.

53.   Pori testified that this was a difficult case, though he believed it to be defensible.  Pori explained that he could not disagree with Gutierrez's insistence on going to trial because there was a possibility that Pori could show that Gutierrez had no connection with the drugs in the junkyard.

54.     The case proceeded to trial and was tried to a hung jury, with an 11 to 1 split in favor of

conviction. [See CR Doc. 68].   Following the mistrial, AUSA Burnham offered Gutierrez

a plea through an 11(c)(1)(C) agreement, again with a likely 10-year sentence, noting that

11 jurors had voted for conviction.  Pori conveyed the offer to Gutierrez, and this time, was

vigorous in his recommendation for acceptance of the plea, but Gutierrez declined.

**Trial Number 2, Sentencing, and Direct Appeal: Representation by Kenneth Del Valle, Esq.**

55.     On December 7, 2005, Kenneth Del Valle, Esq. ("Del Valle") was appointed to represent

Gutierrez. [CR Doc. 95].

56.     Del Valle represented Gutierrez at his second trial, at sentencing, and on appeal.

57.     Del Valle became licensed as an attorney in 1980.  He is licensed in the States of Texas and

New Mexico.   Ninety-nine per cent of Del Valle's practice is criminal defense, and he

estimated that he has represented thousands of defendants and taken hundreds of felony

cases to trial.

58.     Del Valle is an A-panel CJA member and is also qualified to practice in complex litigation.

59.     Upon being appointed to represent Gutierrez, Del Valle spoke with AUSA Burnham, and

also with Brian Pori.   Burnham was again willing to offer the 11(c)(1)(C) plea, and

recommend a 10-year sentence.  Pori provided Del Valle with two banker's boxes full of

information, records, affidavits, pleadings and research.  Del Valle reviewed the entirety of

the contents of both boxes.

60.     Del Valle met with Gutierrez at the jail to introduce himself and to discuss generally the

10

prior trial and its outcome.  It is undisputed[3] that, over the course of his trial preparation, Del Valle met with Gutierrez four to five times prior to trial, and also met with him during proceedings at the courthouse.

61.    Del Valle conveyed to Gutierrez the government's plea offer, as well as its recommendation of a 10-year term of imprisonment.  Del Valle believed that, with good time, the sentence could be reduced to 8 ½ years, and that eligibility for the 500-hour drug program would further reduce the sentence to 7 ½ years.  Del Valle also thought he could make a good argument for early release given Gutierrez's age, meaning that a 7 ½ year sentence could potentially be further reduced.

62.    For his part, in his supplemental pleadings, Gutierrez maintains that no plea agreement was ever presented to him, and that  his attorneys were constitutionally deficient by failing to pursue plea discussions.   [See Doc. 11 at 6-7].  However, during the evidentiary hearing, he reluctantly conceded that a plea offer carrying a likely 10-year term of imprisonment was presented.  He also stated that  Del Valle expressed concern that 10 years was too much time, and stated that he would be able to try the case to an acquittal. [Doc. 53 at 1].

63.    Del Valle urged Gutierrez to accept the plea.  Del Valle testified: "I begged him to take the deal.  He was crazy to go to trial." [See Doc. 53 at 3].  Gutierrez, however, rejected the plea offer, insisting that he would settle for nothing greater than a five-year sentence.

_____

[3] Gutierrez initially contended that he met with Del Valle on only one occasion.  However, during direct and cross-examination at the June 22, 2011 evidentiary hearing, he conceded that while he met Del Valle at the jail on only one occasion, he had other meetings with Del Valle in the court interview rooms. [See Doc. 53 at 1].  The Court finds and accepts as credible testimony that Del Valle and Gutierrez met on a number of occasions.

64.    Del Valle explained to Gutierrez that he was experienced with Judge Brack and knew him to be an excellent judge with compassion in particular kinds of cases.  He cautioned Gutierrez, however, that in a drug case like this, Gutierrez should not expect leniency.  Instead, opined Del Valle, Judge Brack was likely to "launch" Gutierrez.  Accordingly, Del Valle continued to urge Gutierrez to accept the government's plea offer, but Gutierrez declined.

65.    Del Valle also explained that he cautioned Gutierrez about sentencing as a career offender, discussing this either at their second or third meeting.  Thereafter, Del Valle began and ended each interview with Gutierrez him by reminding him of his career-offender status and recommending acceptance of plea.  Each time, Gutierrez rejected the advice. [See Doc. 53 at 3].

66.    At the evidentiary hearing of June 22, 2011, Gutierrez conceded that, having sat through the entire first trial, he was aware of all of the evidence against him prior to the second trial, and was aware that the jury split on the earlier mistrial was 11 to 1 for conviction.  When asked about the likelihood of a conviction on his second trial, given his knowledge of all the evidence against him and the 11 to 1 jury split for conviction, Gutierrez claims that he did not give this too much thought. [See Doc. 53 at 1].

67.    Given Del Valle's experience as a criminal-defense attorney; the outcome of Gutierrez's first trial (i.e., the 11 to 1 split in favor of conviction); Del Valle's assessment of the term of imprisonment likely to result from Gutierrez's acceptance of a plea agreement; and Del Valle's experience with the sentencing court in drug-offense cases of this type, the Court finds and accepts as credible testimony that Del Valle urged Gutierrez to accept the plea offer extended by the government.

12

68.   In his preparation for trial, Del Valle conducted his own investigation and spent several days in Roswell.

69.   Del Valle interviewed Killgo's friend, Ortiz.

70.   Testimony from Ortiz would not have been helpful to Gutierrez, however, since Ortiz saw Gutierrez climb over the fence and enter the junkyard, which in turn caused Ortiz concern that Gutierrez was stealing from Killgo.  Del Valle reasonably decided not to call Ortiz as a witness.

71.   Del Valle also interviewed Peralta.  He originally thought that Peralta would be a good witness because Peralta could confirm that he had never seen Gutierrez climb the fence. However, during the course of the interview, Peralta told Del Valle that he had seen Gutierrez enter the junkyard on multiple occasions through the hole located on the east side of the fence.

72.   Peralta's revelation would not have been helpful to Gutierrez; to the contrary, testimony from Peralta would have been exceedingly detrimental to Gutierrez's defense.  Del Valle needed to place distance between Gutierrez and the junkyard property, and Peralta's testimony would place Gutierrez squarely on the property on multiple occasions.  Thus, Del Valle reasonably decided not to call Peralta as a witness.

73.   Gutierrez claims that, in addition to calling Ortiz and Peralta, Del Valle should have called Killgo as a witness.  Gutierrez contends that Killgo would have testified that he did not sign a consent to search the junkyard.

74.   However, in its order denying Gutierrez's motion to suppress, the district court expressly found that "Mr. Killgo . . . allowed law enforcement officials to search the lot." [CR Doc. 57 at 4].

13

75. Notwithstanding his decision not to call Ortiz, Peralta, and Killgo as witnesses, at trial, Del Valle aggressively and thoroughly cross-examined all of the government's witnesses.

76. As an initial matter, Del Valle pointed out conflicts between statements in the warrant s and at trial.  For example, the affidavits referred to a "Joe Gutierrez," while Defendant's name is Robert Gutierrez.

77. Additionally, during cross-examination of Detective Yslas, Del Valle had the detective admit that the search of Cardona's house resulted in the discovery of an ounce of methamphetamine; electronic scales; packaging materials; 1" x1" jewelry plastic bags commonly used to package gram quantities of methamphetamine; and a firearm.

78. With respect to Roswell law enforcement officers who conducted surveillance on the North Kansas Street address and testified that what they observed was consistent with drug-trafficking activities, Del Valle's cross-examination revealed that they (1) kept no logs during the course of surveillance; (2) recorded no license plate numbers; (3) observed no actual drug transactions; and (4) made no stops of any of the vehicles that drove away after having allegedly purchased drugs.

79. Del Valle had law enforcement officers admit that no drugs or drug paraphernalia were found at the North Kansas Street address or at Gutierrez's own residence on Pennsylvania Street, and that Gutierrez was not the owner of the North Kansas Street address or the junkyard.

80. Del Valle challenged officers' description of Peralta as "elderly," showing photos of Peralta to the officers and having them admit that he looked young and in good health.

81. In challenging testimony concerning Gutierrez's name on the receipt found at the junkyard, Del Valle had a detective review a local phonebook in Roswell and admit that there were

other individuals with the same or similar name.

82. Del Valle challenged the testimony of a law enforcement officer who said that, in his frustration at not finding buried drugs, he stomped his feet, "had a fit," and in this "fit" kicked a bucket that revealed the hidden methamphetamine.

83. Del Valle had this officer confirm that Gutierrez's fingerprints were not found on any of the seized evidence, including electronic scales, baggies, receipts, gloves, batteries or methamphetamine.

84. Del Valle elicited the admission that anyone could have gotten into the junkyard, as there was access to it from several potential points of entry.

85. In cross-examining certain investigating officers, Del Valle had them admit that evidence in particular officers' reports was not collected by that individual officer.

86.  On two occasions, when witnesses inadvertently referred to Gutierrez's criminal history or criminal past, Del Valle moved for mistrials, though he was unsuccessful.

87. As for Cardona, Del Valle was successful in getting her to admit that her use of methamphetamine affected her memory and recall.  Del Valle's cross-examination of Cardona focused on the significant benefits that she obtained as a result of her cooperation, including (1) release from jail; (2) dismissal of all drug charges; (3) dismissal of the stolen lawnmower charge; and (4) a cash payment.

88. Del Valle additionally had Cardona admit that (1) she and her boyfriend were charged with and convicted of auto burglary; (2) her boyfriend was a methamphetamine user; and (3) the lawnmower being sought was at her residence.  Cardona also admitted that if she went to prison, either the State or her relatives would have to take care of her children.

15

89.   Finally, Del Valle was successful in getting Cardona to admit that she was making between $500 and $800 a day in drug sales, and if she sold drugs 365 days a year, using the minimum sales figure, she would have made $182,000.

90.   Del Valle had Cardona outline major expenditures made from her drug sales, but Cardona could only identify a used-vehicle purchase, expensive wheels for the vehicle and a big-screen TV.  Del Valle intimated that Cardona had a large amount of cash, and that the more than $77,000.00 in currency found might have been hers.

91.   Del Valle was able to show that Cardona made inconsistent statements to police, and that her statements at trial were inconsistent with prior statements.  Del Valle was successful in impeaching portions of Cardona's testimony.

92.   Del Valle portrayed Cardona on cross-examination as an individual who would lie to obtain benefits.

93.   In sum, the Court finds and accepts as credible testimony and evidence that Del Valle (1) vigorously cross-examined government witnesses at trial; (2) pointed out significant conflicts in testimony; (3) objected to hearsay testimony; and (4) fought to preclude the admission of evidence adverse to Gutierrez.

94.   Initially at the evidentiary hearing, Gutierrez contended that Del Valle was ineffective at sentencing and should have asked for a below-Guideline sentence.  However, in his own motion, Gutierrez concedes that Del Valle "argued strenuously for either a downward departure or downward variance[,]" [Doc. 1 at 13], and also maintained that, based on Gutierrez's age, a Guideline sentence would, in effect, be a life sentence.  As Del Valle explained to the district court at sentencing, "I don't think this case calls for that." [CR Doc. 155 at 7].  Gutierrez was unable to identify any other sentencing arguments that Del Valle

could or should have made on his behalf.

95.     On the same day the district court entered its judgment in this case, Del Valle timely filed a notice of appeal.  [See CR Docs. 116, 118].

96.      In Del Valle's opinion, the strength of Gutierrez's case was the lack of a sufficient nexus between Gutierrez and the junkyard where the drugs were found.  Thus, on appeal, Del Valle argued the lack of a connection between the drugs and Gutierrez. [4]

97.     The United States Court of Appeals for the Tenth Circuit reviewed the record *de novo*, noting that it was required to ask only whether taking the evidence, both direct and circumstantial, together with reasonable inferences drawn therefrom, and in the light most favorable to the government, a reasonable jury could find Gutierrez guilty beyond a reasonable doubt. See Sedillo-Gutierrez, 263 Fed.Appx. at 661.

98.      After reviewing all of the evidence consistent with the government's theory of the case, the circuit determined that the evidence was indeed sufficient to support the jury's verdict, noting:

> Our study of the record leads us to conclude that the evidence is sufficient to support the jury's determination that the Defendant possessed with the intent to distribute the methamphetamine found by the police secreted in an abandoned lot behind the residence at 1101 North Kansas.  The government showed that Defendant had constructive possession of the methamphetamine.

Sedillo-Gutierrez, 263 Fed.Appx. at 661.

99.     The Circuit summed up its analysis by stating:

> [T]he testimony of the C.I., which was obviously given credibility by the jury, showed that the defendant was indeed engaged in distributing methamphetamine

_____

[4]  See Sedillo-Gutierrez, 263 Fed.Appx. at 660 ("On appeal, counsel frames the one issue he seeks to raise on behalf of the defendant as follows: 'There was not sufficient evidence to find that Mr. Sedillo possessed the contraband in question.'").

out of and from the residence at 1101.  No methamphetamine was found at that residence or at defendant's residence.  However, a considerable amount of methamphetamine was located in the abandoned lot behind the residence at 1101. An officer had found a ladder at the rear of the 1101 residence propped up against the corrugated steel fence that separated the residence from the abandoned lot. And a neighbor testified that he had seen, a couple of weeks before, the defendant "climbing" the fence.  Officers also found a cellular phone receipt in the abandoned lot which contained defendant's name and the address of his mother. Officers found $77,200 in cash in a pickle jar buried outside defendant's mother's house, and list of items used to make methamphetamine at defendant's house. The evidence supports the verdict.

Id. at 661-62.

100.    Notwithstanding this outcome, testified Del Valle, he thought that two of the three circuit

        judges were leaning toward his argument.  Consequently, he was disappointed when he lost

        the appeal.

101.    On July 30, 2008, Gutierrez filed the motion that is now before the Court. [See Doc. 1]

### Analysis

In his *Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody*, Gutierrez claims that both Brian Pori and Kenneth Del Valle provided ineffective assistance of counsel prior to trial, during trial, at sentencing, and on appeal. [See Doc. 1 at 5].  In both his motion and subsequently filed *Supplemental Pleadings in Support of Defendant's Title 28 U.S.C. § 2255 Motion* [Doc. 11], Gutierrez alleges that counsel's performance fell below an objective standard of reasonableness in a number of ways.  According to Gutierrez, Pori and Del Valle failed to (1) advise him of all facts and law relevant to his decision to proceed to trial; (2) discuss with him the strengths and weaknesses of the case against him; (3) challenge deficiencies in the search warrant; (4) pursue plea negotiations or convey to him the government's plea offers; and (5) call witnesses who would have provided favorable testimony.  He also contends

18

that counsel were operating under an actual conflict of interest,[5] gave unreasonable advice regarding potential sentencing, and failed to put forth the strongest arguments available to him on direct appeal. [See generally Docs. 1, 11].

On January 14, 2010, D. Eric Hannum , Esq., ("Hannum") was appointed to represent Gutierrez. [See Doc. 16]. An evidentiary hearing was set, [see Doc. 21], and during a pre-hearing conference[6] held August 31, 2010 before the Honorable Robert H. Scott, United States Magistrate Judge, Gutierrez withdrew his claims of ineffective assistance against Pori, who had successfully defended him to a mistrial. [See Doc. 30]. At the June 29, 2011 evidentiary hearing, Hannum confirmed the withdrawal or waiver of any such claims against Pori. [See Doc. 53 at 1]. Accordingly, any claims or allegations of ineffective assistance asserted against Pori by Gutierrez are waived and are no longer issues for consideration by the Court, which now turns to the remaining claims.

In Strickland v. Washington, the United States Supreme Court established a two-prong test for demonstrating ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was

---

[5] The Court notes that, at the evidentiary hearing, Gutierrez testified that "another guy" helped him prepare his § 2255 motion. [Doc. 53 at 1]. Accordingly, the Court finds that Gutierrez likely had the assistance of a "writ writer" in drafting his motion. Because the motion was prepared by someone other than the movant himself, many of the allegations contained therein lack support. Specifically, while Gutierrez's motion claims that his attorneys "labored under an actual conflict of interest[,]" [Doc. 1 at 18], he testified at the evidentiary hearing that he was unaware of that allegation and was currently unaware of any conflict. See Castro v. Ward, 138 F.3d 810, 821 (10th Cir. 1998). "Unsubstantiated and vague allegations are insufficient to establish an actual conflict of interest." The Court finds that Gutierrez has abandoned, waived, and forfeited any claim that a conflict of interest caused counsel to render ineffective assistance. See United States v. Cruz-Rodriguez, 570 F.3d 1179, 1183 (10th Cir. 2009) (explaining that "[w]aiver is the intentional relinquishment or abandonment of a known right [while] forfeiture is the failure to make the timely assertion of a right.").

[6] A pre-hearing conference "may limit the questions to be resolved, identify areas of agreement and dispute, and explore evidentiary problems that may be expected to arise." Rule 8 of the Rules Governing Section 2254 Cases in the United States District Courts (Advisory Committee Notes, 1976 Adoption (c)).

> deficient. This requires showing that counsel made errors so serious
> that counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. Second, the defendant must
> show that the deficient performance prejudiced the defense. This
> requires showing that counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 688 (1984); see also Boyle v. McKune, 544 F.3d 1132, 1137 (10th Cir. 2008).

When a court considers a claim of ineffective assistance of counsel, it must view the reasonableness of the challenged conduct "as of the time of the conduct." Dever v. Kansas State Penitentiary, 36 F.3d 1531, 1537 (10th Cir. 1994). The movant bears the burden of identifying the acts or omissions alleged not to have been the result of reasonable professional judgment, with the pertinent question then becoming "whether the identified acts or omissions were outside the wide range of professionally competent assistance." Id. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Id.

"Judicial scrutiny of counsel's performance must be highly deferential." Strickland, 477 U.S. at 689. Additionally "[t]here is a strong presumption that counsel's performance falls within the wide range of professional assistance[;] the defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." Williamson v. Ward, 110 F.3d 1508, 1514 (10th Cir.1997) (quoting Kimmelman v. Morrison, 477 U.S. 365, 381 (1986)). Finally, "[n]either hindsight nor success is the measure" of effective counsel, which is not necessarily synonymous with victorious or flawless counsel. Dever, 36 F.3d at 1537. Rather, to be considered ineffective assistance of counsel, "the representation must have been such as to make the trial a mockery, sham, or farce, or resulted in the

20

deprivation of constitutional rights." Id. (*citing* Lorraine v. United States, 444 F.2d 1, 2 (10th Cir. 1971)).  Applying these standards, the Court finds that Gutierrez has not satisfied his burden of showing that he received ineffective assistance of counsel at any stage of the proceedings.

## I.        Counsel's Pretrial Performance

According to Gutierrez, counsel failed to challenge deficiencies in the search warrant and the underlying affidavit. [See Doc. 1 at 6].  This argument is completely devoid of merit or support in the record.  To the contrary, this Court has already found and accepted as credible testimony and evidence presented at the June 22, 2011 hearing that counsel pointed out that the affidavit named a "Joe Gutierrez," while Defendant's first name is Robert. [See supra ¶ 76].  Similarly, Gutierrez's allegation that "[d]efense counsel knew the search warrant was procedurally defective and Constitutionally invalid, but took no action to challenge the defective warrant or suppress the 'fruits' of the illegal search[,]" [Doc. 11 at 6], is flatly contradicted by the motion to suppress that was filed by Pori on June 13, 2005, and denied by the district court on August 11, 2005. [See CR Docs. 30, 57].  That counsel was not successful on the suppression motion does not indicate substandard performance.[7]   See Dever, 36 F.3d at 1537.

With respect to Gutierrez's argument that counsel was ineffective for failing to pursue plea negotiations and/or failing to convey to him plea offers extended by the government, the Court notes that "[i]t is well-established . . . that counsel does not have an absolute obligation to pursue plea negotiations in every case."   Welch v. United States, 370 Fed.Appx. 739, 742 (7th Cir. 2010).  Indeed, under the circumstances presented, it was reasonable not to pursue a plea agreement, since

---

[7]  The Court also notes that, though he did not prevail on his motion to suppress, Pori *was* successful in preventing the government from introducing potentially damaging Rule 404(b) evidence. [See CR Doc. 57 at 10-11].

(1) at best, Gutierrez likely faced a term of imprisonment of approximately seven years but remained adamant in refusing any plea offer that was unlikely to result in a sentence five or fewer years; and (2) counsel believed that weak evidence of a connection between Gutierrez and the methamphetamine and other contraband made his case a potentially defensible one.  See also United States v. Turchi, 645 F.Supp. 558, 567-568 (E.D.Pa. 1986) (counsel was not required to initiate plea negotiations where, among other things, counsel believed that (1) chief witness against defendant was not truthful and counsel could show as much during trial; (2) jury also would also find witness not credible; and (3) case against defendant was weak and unlikely to succeed).

By contrast, while an attorney *does* render ineffective assistance of counsel by failing to convey to his or her client a plea offer extended by the government, see Pham v. United States, 317 F.3d 178, 183 (2nd Cir. 2003),[8] such was not the situation here.  To be sure, notwithstanding his original contention that "[d]efense counsel never provided Mr. Gutierrez with the government's plea offer[,]" [Doc. 11 at 6 (emphasis in original)], Gutierrez's own testimony at the June 22, 2011 evidentiary hearing, as well as a letter of May 13, 2005 from Brian Pori to Gutierrez describing a proposed plea, indicate that Pori did indeed convey and explain to Gutierrez the plea offer made by the government. [See Doc. 53 at 1; attached Exh. List (Exh. 2)].  In light of the foregoing, this Court concludes that Gutierrez has failed to demonstrate ineffective assistance of counsel at the pretrial stage of the proceedings.

---

[8]   "[T]here is no dispute that failure to *convey* a plea offer is unreasonable performance."  Pham, 317 F.3d at 183 (2nd Cir. 2003) (emphasis in original).

## II.   **Counsel's Trial Performance**

At trial, counsel aggressively and thoroughly cross-examined all government witnesses. For example, counsel was able to elicit from testifying law enforcement officers concessions to cast doubt on their powers of perception and observation. Specifically, counsel was successful in getting officers who had previously described Miterio Peralta as "elderly" to contradict themselves on the stand and admit that, in photographs, Peralta appeared to be young and in good health. Counsel challenged the officers' record- and log-keeping practices and information-collecting methods, and drew from them testimony that Defendant Robert Gutierrez was not the only Robert Gutierrez in Roswell at the time in question. As for Estanislada Cardona, counsel's cross-examination (1) highlighted her own criminal history; (2) revealed inconsistencies in her trial testimony and her statements to police; and (3) raised an inference of bias. In short, counsel worked to attack and challenge the credibility of the government's witnesses, and Gutierrez has presented no evidence tending to demonstrate that, in so doing, counsel somehow performed inadequately, substandardly, or below par.

Finally, Gutierrez objects to counsel's failure to call Peralta, Ortiz, and Killgo as witnesses on his behalf. As counsel explained at the evidentiary hearing, however, an interview with Peralta revealed that, while it was true that Peralta had never seen Gutierrez climb over the fence, he *did* see Gutierrez enter the junkyard through the hole in the fence. [See Doc. 53 at 2]. Assessing this proffered testimony as more detrimental than beneficial, counsel opted not to call Peralta as a witness. Ortiz similarly would have placed Gutierrez in the junkyard, where he believed Gutierrez was stealing from Killgo. Lastly, given the district court's determination that "Mr. Killgo . . . allowed law enforcement officials to search the lot[,]" [CR Doc. 57 at 4], there was no point in counsel calling Killgo for the purpose of having Killgo testify, as Gutierrez wanted, that he did not

23

consent to the search. [See Doc. 1 at 15 ("[A]ny reasonable attorney would have in the least interviewed the owner of the "junkyard" regarding the fact that he did not give authority to anyone to search his property.")].  The Court concludes that counsel reasonably decided not to call Peralta, Ortiz, and Killgo as witnesses in Gutierrez's defense.  See United States v. McGehee, 307 Fed.Appx. 145, 148 (10th Cir. 2009) (decision to call witnesses "is quintessentially a matter of strategy," and concluding that counsel was not ineffective for failing to call witness who would have "opened the door to harmful testimony regarding" defendant).

### III.    Counsel's Post-Conviction Performance

Gutierrez's final arguments—that counsel performed inadequately at sentencing and then on appeal—are equally unavailing and quickly disposed of. As with a number of his other claims, Gutierrez's assertion that counsel was unprepared for sentencing and "complete[ly] fail[ed] . . . to argue convincingly for a reduced sentence[,]" [Doc. 11 at 13], is belied both by his earlier statement that "counsel argued strenuously for either a downward departure or downward variance[,]" [Doc. 1 at 13], and the transcript of the sentencing proceedings, which reflects that strenuous argument. [See generally CR Doc. 155].

Likewise, counsel filed a timely notice of appeal. [See CR Doc. 118].  Counsel believed that his strongest point on appeal was the lack of a nexus between Gutierrez and the junkyard where the methamphetamine was found, and focused on that point in his arguments to the Tenth Circuit.  See Sedillo-Gutierrez, 263 Fed.Appx. at 660 ("On appeal, counsel frames the one issue he seeks to raise on behalf of the defendant as follows: 'There was not sufficient evidence to find that Mr. Sedillo possessed the contraband in question.'").  Ultimately counsel lost the appeal, but believed from the panel's questions that two of the three appellate judges were leaning toward his argument.  Again, the fact that counsel did not prevail on appeal is not necessarily indicative of deficient performance.

24

See Dever, 36 F.3d at 1537.  This Court finds that Gutierrez has failed to satisfy his burden of showing counsel were ineffective at sentencing and appeal.

### Conclusions and Recommendation

Having considered the relevant authorities, the record and evidence before it, and based on the findings set forth above, the Court concludes that Robert Gutierrez has failed to meet his burden of showing that either Brian Pori or Kenneth Del Valle rendered ineffective assistance of counsel. Indeed, the Court concludes that neither Pori's nor Del Valle's conduct fell below the objective standard of reasonableness set forth in Strickland.

The Court further concludes that, even assuming deficient conduct on the part of either attorney, Gutierrez has failed to demonstrate how such conduct prejudiced his defense.  That is, Gutierrez does not show that but for counsel's allegedly unprofessional errors, there is a reasonable probability that the result of his criminal proceeding would have been different.

For all of the reasons set forth above, the Court concludes that Gutierrez's *Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody* lacks merit. Accordingly, the Court recommends that the motion be **DENIED** and this civil proceeding be **DISMISSED with PREJUDICE**.


_____
*Lorenzo F. Garcia*
LORENZO F. GARCIA
UNITED STATES MAGISTRATE JUDGE